UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| RAYMOND P. BUDO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:09CV1643 CDP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Raymond Budo's application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*

Claimant Budo brings this action asserting that he his disabled because he suffers

coronary artery disease, advanced stable angina, non-insulin dependent diabetes,

depression, and post-traumatic stress disorder. The Administrative Law Judge

concluded that Budo is not disabled the Social Security Act. Budo appeals the

decision denying him disability benefits. Because the ALJ's assessment of Budo's

residual functional capacity is not supported by substantial evidence, I will reverse

the ALJ's decision and remand to the Commissioner for further consideration.

-1-

<u>Procedural History</u>

On March 31, 2006, Raymond Budo filed the current application for

Disability Insurance Benefits alleging a disability onset date of June 30, 2005.

The Social Security Administration denied Budo's application at the initial level

on August 1, 2006, and Budo filed a timely hearing request. Budo appeared and

testified at a hearing held on October 31, 2007. The Administrative Law Judge

("ALJ") issued an opinion on December 17, 2007 upholding the denial of benefits.

On February 8, 2008, Budo requested that Appeals Council of the Social Security

Administration review the ALJ's decision. The Appeals Council denied Budo's

request on August 17, 2009. The ALJ's decision thus stands as the

Commissioner's final decision and Budo has exhausted his administrative

remedies. Budo filed this appeal on October 2, 2009.

<u>Testimony Before the ALJ</u>

Budo testified that he had previously worked as a sales and marketing

manager for the cable industry and as a children's photographer for a photo lab.

Much of his work involved door-to-door sales as well as supervising other

salespeople working in the field. He stopped working in 2005 because he was

having chest pains, felt sick and tired constantly, and was sleeping from twelve to

fourteen hours per day. Budo testified that he had open-heart surgery in 1997 and,

in July 2005, the placement of a cardiac catheter and stent. Budo stated that he had additional stenting done in 2006 and balloon dilation in August of 2006. Budo further testified that one artery will remain clogged and there are no additional procedures that can alleviate it.

At the time of the hearing, Budo testified that he had chest pains at all times, for which he was given Isosorbide and Ranexa. When his chest pains become severe, he takes sublingual nitroglycerine, which usually alleviated the pain. If three nitroglycerines would not alleviate his pain, he stated that he went to the emergency room. He estimated that he usually took six to eight sublingual nitroglycerines per week. Budo further stated that he usually did not have chest pain when sitting on the couch, but found sitting with his legs down to be stressful. He testified that he could stand for only fifteen minutes without having to rest and had to stop and rest when walking up or down a flight of stairs. In order to walk without chest pain, he testified that he has to walk at a very slow pace. Budo claimed to be fatigued all the times, which had gotten progressively worse since he ceased working in 2005. He testified that in an eight hour period after awaking in the morning, he sleeps or rests for three to four hours and he was unable to make it through a whole day without doing so. He could no longer tolerate direct sun exposure or long periods of time outdoors.

Budo further testified that he was diagnosed with sleep apnea in 2006, for which he was given a sleep machine and Trazodone, both of which have greatly alleviated his sleep difficulties.

Budo also indicated in his testimony that he suffered from depression. He saw a psychiatrist every three months and was given some drugs for his depression. Budo testified that the therapy made him feel that he no longer wants to die, but he still has difficulty concentrating and remembering. He claimed that he could longer concentrate on anything more than short paragraphs when reading and stated his mind constantly went on tangents.

The ALJ called a vocational expert, Dr. McGowan, who testified at the hearing. The ALJ asked Dr. McGowan whether a hypothetical individual who is 58 years old, has 13 years of education, who is able to lift and carry up to 20 pounds occasionally, 10 pounds frequently; can stand or walk for six hours out of eight; sit for six hours out of eight; occasionally climb stairs and ramps; occasionally climb ropes, ladders, and scaffolds; and should avoid concentrated exposure to extreme cold and extreme heat could perform any of Budo's past relevant work or work in the national economy. Dr. McGowan testified that Budo could perform those jobs as they were described in the Dictional of Occupational Titles, but that Budo could not perform those jobs in the way that he performed

them in the past. Dr. McGowan testified that while Budo could perform as a marketing manager in the national economy, Budo had previously performed the job as a marketing manager plus sales, which the hypothetical claimant would not be able to perform. The ALJ then asked Dr. McGowan whether a second hypothetical individual with the same background information as the first who would be able to lift and carry up to 20 pounds occasionally, 10 pounds frequently; stand or walk for two hours out of eight; sit for six; could occasionally climb stairs and ramps, never ropes, ladders and scaffolds; and avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts and gases and the hazards of unprotected heights could perform any of the claimant's past relevant work or work in the national economy. Dr. McGowan replied that this hypothetical individual could perform only the job of marketing manager, as defnied by the DOT, but not as Budo performed it because he worked as a marketing manager plus sales. Budo's attorney then asked whether the second hypothetical individual, who also need to rest several hours per day, would be capable of performing any of the claimant's past relevant work or any jobs available in the national economy. Dr. McGowan testified that such a person would not be able to perform any of Budo's previous work or any jobs nationally available.

<u>Medical Records</u>

The first medical record is dated July 08, 2005, and indicates that Budo had a history of coronary artery disease with myocardial infarction. In 1997, Budo underwent open-heart four vessel coronary artery bypass surgery. His status-post recent stent placement had features of metabolic syndrome, non-Insulin dependent diabetes mellitus, as well as known hypertension and hyperlipidemia. Budo had been observed to snore heavily and had a long history of recurrent nocturnal arousal and increasing drowsiness. The initiation of CPAP improved Budo's sleep quality. He was given a Thallium Stress Test and attained 88% of his maximum predicted heart rate, but the test was prematurely terminated due to leg fatigue and moderately severe shortness of breath. The diagnosis was negative for angina and ischemia and the doctor noted a somewhat reduced capacity in physical conditioning. Furthermore, Budo was given a US Doppler Cartoid Complete Exam, which found minimal plaque within the distal right common cartoid artery extending into the carotid bifurcation and minimal atherosclerotic plaque within the distal left common carotid artery extending into the carotid bifurcation. The doctor noted antegrade flow in both vertebral arteries. PA and lateral views of the chest showed that the cardiac silhouette was at its upper limits of normal to mildly enlarged with aortic atherosclerosis and poststernotomy coronary bypass changes.

Dr. Reh noted mildly prominent interstitial markings within the left perihilar and infrahilar regions without active or confluent infiltrates and degenerative changes throughout the thoracic spine.

On July 20, 2005, Budo underwent left heart catherization, selective right and left coronary angiograms, left ventriculogram, selective sapehnous vein angiogram, free radial artery graft angiogram, left internal mammary anteriogram, and PTCA of saphenous vein graft stenosis. Dr. Manog K. Eapen noted that Budo's left main artery had 50% diffuse disease, LAD had 70% diffuse disease, left circumflex was totally occluded at the proximal segment, ramus intermedius was occluded at the proximal area with mild disease, and right coronary artery was a dominant vessel and was totally occluded at the mid level, and the proximal stent had a 90% diffuse stenosis. Dr. Eapen recommended Plavix 75mg daily for six months, Aspirin 81mg daily, adjunctive medical treatment, as well as regular exercise and diet program.

On August 29, 2005, Budo underwent sleep analysis at the Sleep Studies Center at St. Joseph Hospital. Dr. Kirk E. Flury, the treating physician, noted that Budo showed evidence of severe sleep disordered breathing with nearly continuous obstructive apnea/hypopnea, 95 obstructive apneas, 19 obstructive hypopneas, and the apnea/hypopnea index scored at 47 events an hour. Dr. Flury

recommended the initiation of a CPAP, which actually improved Budo's sleep during the analysis.

On January 20, 2006, Budo underwent Dual Isotope Stress Test and Nuclear Imaging. Budo completed 7 minutes and 29 seconds of treadmill exercise achieving a cardiac workload of 10.1 METs and the predicted exercise time based on Budo's age and activity was 8 minutes and 30 seconds. His peak heart rate was 134, which was 83% of his age predicted maximum. Budo complained of dull pain in chest prior to exercising and his vitals and symptoms returned to baseline approximately four minutes into recovery. The nuclear imaging test indicated mildly decreased activity along the inferior portion of the left ventricle.

Budo underwent a chest x-ray on April 26, 2006, which indicated mild cardiomegaly with aortic atherosclerosis and post sternotomy coronary bypass changes.

On May 04, 2006, Dr. Leonard Fagan, Budo's treating cardiologist, advised Budo to "take it easy" as a result of recurring symptoms of chest pain.

On May 11, 2006, Budo was taken to the emergency room and records indicate that he felt tired, had difficulty breathing, felt cold, complained of a stiff neck, and had a fluttering feeling in his chest. Budo underwent the following procedures: left heart catheterization, coronary arteriography, left ventriculogram,

graft study, IC-NTG given for coronary vasospasm, and successful stenting of the distal segment of vein graft to the circumflex. Dr. Michael G. Goldmeier found that left main had diffuse plaquing with an ostial 35% stenosis and the patient had significant diffuse disease in the native distal circumflex after the vein graft touchdown that is not amenable to percutaneous intervention.

Budo underwent a Dual Isotope Stress Test and Nuclear Imaging on August 22, 2006. Budo completed seven minutes of treadmill exercise achieving a cardiac workload of 10 METs (predicted exercise time based on Budo's age and activity was 9 minutes). His peak heart rate was 105, which was 65% of age predicted maximum. The test was limited by symptoms of shortness of breath and fatigue. The nuclear imaging showed mildly decreased activity along the inferolateral portion of the left ventricle, though the defect appeared to be reversible between stress and rest imaging. As a result of this test, Dr. Fagan diagnosed new ischemia in the region of known disease.

Records further indicate that on August 30, 2006, Budo underwent left heart catheterization, coronary arteriography, graft study times three, balloon dilatation of the distal posterolateral circumflex via the vein graft, and was given IC-NTG for coronary vasospospasm. Dr. Goldmeier concluded: 1) Coronary angiography demonstrates high-grade native three-vessel disease (old and unchanged); 2) The

graft study demonstrated that all grafts are patent; and 3) Successful balloon dilatation of the distal anastomosis, decreasing the 60-80 percent stenosis down to 30-60 percent residual.

Dr. Fagan issued a letter on May 04, 2007, which stated that Budo has been on maximal medical therapy and continues to experience chest discomfort with exertion, relieved with sublingual nitroglycerin, and has been using nitroglycerin prophylactically with activities that may precipitate symptoms. He had been experiencing increased fatigue and decreased energy for several weeks prior to the date of the letter. Dr. Fagan issued a letter on May 10, 2007 which indicated that Budo has advanced coronary artery disease who is status post revascularization and a recent course of external enhanced counter pulsation ("EECP") treatments for refractory angina.

In Dr. Fagan's Physician's Assessment for Social Security Disability Claim, dated June 05, 2007, he diagnosed Budo with coronary artery disease and angina, which were stable with minimal activity. Additionally, Dr. Fagan wrote that "patient should refrain from any physical exertion." Dr. Fagan stated that Budo's endurance was affected by his impairments, but he did not answer how many hours in an eight hour workday Budo would need to rest. Dr. Fagan noted that Budo was disabled from cardiac standpoint in response to the question of whether

patient's condition would prevent him from engaging in sustained full time employment.

Advanced Practice Nurse Barbara S. Latal assessed Budo as having Major Depression on July 20, 2007. She noted that Budo sleeps for 11-12 hours if he does not set an alarm and recommended that he set an alarm so that he sleeps no more than 10 hours in a night. She further recommended that Budo limit his naps to one-half hour in the morning and/or afternoon. She recommended that Budo continue to take Buproprion and Trazodone. Furthermore, Dr. Fagan saw Budo on July 20, 2007 after Budo complained of chest discomfort that awakened him in the middle of the night and required two sublingual nitroglycerine doses for relief. Despite this episode, Budo stated that he felt that he had been using fewer nitros since going on 500mg of Ranexa. Dr. Fagan increased Budo's dose of Ranexa from 500mg to 1000mg daily.

Dr. Reh completed the Physician's Assessment for Social Security Disability Claim on August 31, 2007. He noted that Budo suffers from chronic stable angina, coronary artery disease--post myocardial infraction and coronary artery bypass graft--hypertension, and non-insulin dependent diabetes mellitus (NIDDM). Dr. Reh stated that Budo tired quickly with exertion, sleeps a lot, and that Budo would need to rest for several hours of each day in an 8 hour workday.

He concluded that Budo's condition would prevent him from working at any employment.

On October 09, 2007, Dr. Fagan described in a letter that Budo had recurrent anginal symptoms since January 2007. His anginal symptoms increased and he was begun on Ranexa, which was titrated up to 1000 mg bid (sic) with resolution of many of his symptoms. Dr. Fagan recommended that Budo remain on both aspirin and Plavix long term.

Dr. Fagan completed the Supplemental Physician's Assessment for Social Security Disability Claim on January 25, 2008 and wrote that Budo had refractory angina pectoris and was totally disabled from a cardiac standpoint. He further explained that despite maximal therapy, Budo still experienced chest pain. Budo still had frequent chest pain and sometimes took as many as 4-5 sublingual nitroglycerine doses per day. Budo also underwent a 30 minute medication evaluation due to the onset of crying spells and noted stress related to his settling his deceased brother's life insurance and worrying about his mother's ability to survive financially.

Dr. Reh completed the Supplemental Physician's Assessment for Social Security Disability Claim on February 6, 2008 and wrote that Budo's medical conditions prevents him from engaging in sedentary work due to his heart

condition and that he is fatigued on a daily basis. Also on this date, Budo missed a dose of Renexa and began having chest pains, which sublingual nitroglycerine did not alleviate. He drove himself to the fire station and they took him by ambulance to St. Joseph's Hospital. After being given a dose of Renexa, he felt better and all blood tests came back normal.

Budo received treatment from Psychologist Sarah S. Shia, Ph.D on February 27, 2008. Dr. Shia treated Budo for depression and stress management, noting that he felt more stable since last treatment, but that his depression oscillates. He was unable to manage when several issues arise at once. Also on this day, Budo's LDL levels were elevated and he admitted that he was only taking one-half of his recommended dose of Zocor. Dr. Madhuri Subbaiah advised him to take the entire recommended dose.

On May 19, 2008, Budo completed the last of 35 EECP treatments, according to a letter from EECP Technician Laurie Sandler to Dr. Fagan. Ms. Sandler noted in the letter that Budo's energy level was good and he felt good. Additionally, Dr. Karen Cowan completed a psychiatric examination of Budo and noted that Budo had multiple psychiatric interventions throughout his life. He reported symptoms consistent with post-traumatic stress disorder after tour in Vietnam, which included anger, depression, increased anxiety, flashbacks,

nightmares, increased startle response, and hypervigilence. His depressive symptoms were classic with low mood, hopelessness, thoughts of suicide, which were worse a few years ago but he had no such thoughts at that time. While he had problems sleeping, change in appetite, decreased motivation, low energy, and increased anxiety, there were no psychotic, manic, panic, or other symptoms to report at that time. Dr. Cowan noted in her report that Budo was working for Ridgeway Insurance Group and Aflac attempting to sell insurance at the time she made her report. She further noted that Budo smoked cigarettes on occasion.

On July 22, 2008, Dr. Cowan noted that Budo was being treated for Post-Traumatic Stress Disorder and Depression. She stated that Budo had been feeling worse over the past month, which included problems sleeping, low energy, anhedonia, problems concentrating, and increased anxiety about memories of Vietnam. He felt that he may have been better off dead, but he denied any thoughts of suicide.

In a letter to Dr. Reh dated September 30, 2008, Dr. Fagan wrote that Budo's chronic angina was prompting him to occasionally use sublingual nitroglycerine prophylactically prior to walking 4-5 times per week. Furthermore, Dr. Fagan noted the following impressions: 1) Coronary artery disease status post coronary bypass grafting and status post EECP–his angina pattern had increased;

2) Hyperlipidemia; 3) Diabetes; 4) Hypertension; and 5) Obstructive sleep apnea.

Budo underwent a Adenosine Dual Isotope Stress Test and Nuclear Imaging on October 03, 2008. The report shows that doctors unsuccessfully attempted to stent the distal branch of the vein graft to the circumflex artery. In May 2006 the distal branch was dilated by balloon angioplasty and he eventually underwent a repeat cardiac catherization in May 2006 with stenting of the distal vein graft. The report notes that he continued to have symptoms of chest pressure and underwent external enhanced counter pulsation and continued to have a crescendo anginal pattern. Budo began the test and using standard Bruce protocol and walked for one minute and forty-four seconds. This represented a MET of less than 4 and his heart rate rose to 97, which was 60% of his age predicted maximum. The test was limited by shortness of breath, which rendered Budo unable to complete the test. There were no arrhythmias and the test was switched to the adenosine stress test receiving 82mg of adenosine infused over 8 minutes and 16 seconds using standard infusion technique with the patient in an incumbent position. Budo experienced chest pain during the test, which subsided when given sublingual nitroglycerine. The nuclear imaging showed no evidence of ischemia.

Budo was treated for post-traumatic stress disorder from September 22, 2008 to July 23, 2009 by Dr. Herbert Lomax. Dr. Lomax noted that Budo was

actively participating in a PTSD group, which consisted of problem-solving

intervention, approximately every two weeks.  In a progress note dated March 16,

2009, Dr. Lomax wrote that psychotropic medications and psychotherapy have

helped him to move from "feelings of being stuck" to increased optimism,

improved quality of life and the hope of recovery.

## Legal Standard

A court's role on review is determine whether the Commissioner's findings

are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*,

242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a

preponderance, but is enough so that a reasonable mind would find it adequate to

support the Administrative Law Judge's conclusion.  *Prosch v. Apfel*, 201 F.3d

1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record

to support the Commissioner's decision, a court may not reverse it because

substantial evidence exists in the record that would have supported a contrary

outcome, *id.*, or because the court would have decided the case differently.

*Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether

existing evidence is substantial, a court considers "evidence that detracts from the

Commissioner's decision as well as evidence that supports it."  *Singh v. Apfel*, 222

F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050

(8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his relevant past work. If the claimant can perform his relevant past work, he is not disabled.

At this stage, if the claimant demonstrates that he has an impairment of combination of impairments that do not meet or equal an impairment listed in the regulations but which preclude him from performing his last regular work, the burden shifts to the Commissioner to show the existence of some other type of work that an individual with the claimant's impairments is capable of performing.

*Foreman v. Callahan*, 122 F.3d 24, 25 (8th Cir. 1997); *Butler v. Secretary of Health & Human Services*, 850 F.2d 425, 426 (8th Cir. 1988). If the claimant has solely exertional impairments, the ALJ may apply the Medical-Vocational Guidelines contained in 20 C.F.R., Subpart P, Appendix 2, to meet this burden. *Foreman*, 122 F.3d at 25. However, when significant nonexertional limitations exist, the ALJ must call a vocational expert to testify to the existence of jobs that a person with the claimant's impairments is capable of performing. *Id.* at 26; *Talbott v. Bowen*, 821 F.2d 511, 515 (8th Cir. 1987).

If the claimant cannot perform his relevant past work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by

*Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness, and side effects of any medication; and (6) the claimant's functional restrictions.

*Id.* at 1322.

## The ALJ's Findings

The ALJ found that Budo was not disabled considering his age, education, work experience, and residual functional capacity. He issued the following specific findings:

1.  The claimant met the insured status of the Social Security Act through December 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since June 30, 2005, the alleged onset date. 20 C.F.R. § 404.1520(b).

3.  The claimant has the following severe impairments: residuals of bypass surgery. 20 C.F.R. § 404.1520(c). His non-severe impairments are depression, diabetes mellitus, and sleep apnea.

4.  The claimant's medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe. 20 C.F.R. § 404.1520a(d)(1).

5.  The claimant does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart B, Appendix 1. 20 C.F.R.

§ 404.1520(d).

6.  The claimant has the residual functional capacity to perform the full range of sedentary work.  20 C.F.R. § 404.1567(a).

7.  The claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible.

8.  The residuals of bypass surgery are the claimant's only disabling impairment.

9.  The residuals from his coronary disease are severe, but do not preclude him from engaging in all work-related activities.

10. The claimant is capable of performing past relevant work as a marketing manager, as it is customarily performed in the national economy.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

11. The claimant has not been disabled in accordance with the Social Security Act.  He is not entitled to a Period of Disability and Disability Insurance Benefits.

## Discussion

As previously mentioned, when reviewing a denial of Social Security benefits, a court must determine whether there is substantial evidence on the record as a whole to support the ALJ's decision.  42 U.S.C. § 405(g); *Gowell*, 242 F.3d at 796.  Raymond Budo raises three issues on appeal from the final determination denying disability.  First, Budo claims that the administrative law

judge failed to properly consider the opinion evidence proffered by Budo's two treating physicians, Drs. Reh and Fagan. More specifically, Budo argues that the ALJ provided no specific rationale for rejecting the medical source statements of Budo's treating physicians. Second, Budo argues that the ALJ mischaracterized the testimony from the Vocational Expert who stated that Budo would not be capable of performing his past relevant work of marketing manager plus sales. Finally, Budo argues that the ALJ failed to consider depression as a severe impairment. Budo argues that the ALJ failed to develop the medical records after determining that the VA records were incomplete and that the evidence on the record is sufficient to confirm that Budo suffers from medically determinable impairments of depression and post-traumatic stress disorder. Because I find that the ALJ improperly considered the opinions of treating physicians Drs. Reh and Fagan when determining Budo's residual functional capacity, I will only address that argument in this memorandum.

Residual functional capacity is what the claimant can still do despite his or her physical or mental limitations. 20 C.F.R. pt. 404.1545(a); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). Although the ALJ is not

limited to considering only medical evidence in making this assessment, the ALJ

is "required to consider at least some supporting evidence from a professional"

because a claimant's residual functional capacity is a medical question. *Lauer*,

245 F.3d at 704.

When considering professionals' opinions, the ALJ must defer to a treating

physician's opinions about the nature and severity of a claimant's impairments,

"including symptoms, diagnosis, and prognosis, what an applicant is capable of

doing despite the impairment, and the resulting restrictions." *Ellis v. Barnhart*,

392 F.3d 988, 995 (8th Cir. 2005) (citing 20 C.F.R. pt. 404(a)(2).)  A treating

physician's opinion regarding an applicant's impairment will be granted

controlling weight, provided the opinion is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with the other substantial evidence in the record.  *Kelley v. Callahan*, 133 F.3d

583, 589 (8th Cir. 1998).  While a treating physician's opinion is usually entitled

to great weight, the Eighth Circuit has cautioned that it does not automatically

control, since the record must be evaluated as a whole.  The Eighth Circuit has

upheld an ALJ's decision to discount or disregard the opinion of a treating

physician in situations where other medical assessments are supported by better or

more thorough medical evidence or where a treating physician gives inconsistent

opinions that undermine the credibility of the opinions. *Prosch v. Apfel*, 201 F.3d

at 1013 (quoting *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997)). In any

event, whether the ALJ grants a treating physician's opinion substantial or little

weight, the regulations require the ALJ to always give good reasons for the

particular weight the ALJ chooses to give. *Singh*, 222 F.3d at 452.

The ALJ concluded that Budo could perform the full range of sedentary

work. I agree with the plaintiff that in reading this decision the ALJ failed to

provide a good reason for the weight he gave to the opinions of Drs. Reh and

Fagan, Budo's treating physicians. Dr. Reh completed an RFC form in which he

made conclusory statements about Budo's functional limitations that, if believed,

would render Budo disabled. Additionally, Dr. Fagan completed the same RFC

forms and offered opinions consistent with the conclusions of Dr. Reh. The ALJ

mentioned their opinions but then gave them little weight.

Dr. Reh concluded that Budo becomes fatigued with exertion, sleeps a lot,

and that Budo would need to rest for several hours of each day in an 8 hour

workday. Dr. Fagan wrote that Budo suffers advanced coronary artery disease and

chronic angina that is stable with minimal activity and was at maximal medical

therapy. He further noted that Budo was disabled from a cardiac standpoint.

These conclusions are both consistent with each other and the medical records as a

whole. While the ALJ explicitly states that he did not find Budo's statements concerning the intensity, persistence, and limiting effects of his impairments to be entirely credible, he offers no such explicit conclusion regarding the opinions of Drs. Reh and Fagan. The ALJ accurately summarizes that Budo achieved 10.1 METS during a January 2006 stress test, which indicates that the claimant might be capable of light work. Yet, the medical record as a whole, as well as the deteriorating nature of Budo's condition, undermine the ALJ's conclusion. The ALJ, for example, failed to mention that Budo complained of chest pain during the January 2006 stress test and a stress test administered during August 2006 was limited by chest pain, shortness of breath, and fatigue. Additionally, a thallium stress test administered to Budo in July of 2005 was terminated due to leg fatigue and moderately severe shortness of breath. Since the inconsistencies between the opinions of Drs. Reh and Fagan which the ALJ seems to describe are, in fact, consistent with each other and with the medical records as a whole, the ALJ does not provide sufficient reasons for discounting the opinions of Budo's treating physicians. *See, e.g. Prosch v. Apfel*, 201 F.3d at 1013 (where the court held that the ALJ gave sufficient reasons for discounting the treating physician's evaluation when the ALJ noted that the physician's opinion on disability was different than the one he gave three weeks earlier and his conclusions were inconsistent with

three other physicians) and *Reed v. Barnhart*, 399 F.3d at 921 (where the court held that the ALJ did not give sufficient reasons for discounting the treating physician's evaluation when the ALJ stated that there were inconsistencies in the physician's record when in fact there were not).

Because the ALJ failed to explain adequately why he gave less weight to the opinions of the treating physicians, the decision is not supported by substantial evidence on the record as a whole. I will therefore reverse the decision and remand the case to the Commissioner for further proceedings consistent with this opinion.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and the case is remanded under sentence four of U.S.C. 3405(g) for the reasons stated herein.

A separate judgment is accord with this Memorandum and Order is entered this date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 6th day of December, 2010.